1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4   IN RE OCULAR THERAPEUTIX, INC.    )
                                      )   No. 17-CV-12288-GAO
5   SECURITIES LITIGATION,            )

6

7

8

9
            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
10                 UNITED STATES DISTRICT JUDGE
                         MOTION HEARING
11

12

13
            John Joseph Moakley United States Courthouse
14                      Courtroom No. 22
                       One Courthouse Way
15                 Boston, Massachusetts 02210

16
                        February 6, 2019
17                        2:00 p.m.

18

19

20

21              Kathleen Mullen Silva, RPR, CRR
                     Official Court Reporter
22       John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 7209
23                 Boston, Massachusetts 02210
                  E-mail: kathysilva@verizon.net
24

25          Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2
              Pomerantz LLP
 3            Austin Van, Esq.
              600 Third Avenue
 4            New York, New York 10016
              212.661.1100
 5            and
              Andrews DeValerio
 6            Daryl DeValerio Andrews, Esq.
              265 Franklin Street, Suite 1702
 7            Boston, Massachusetts 02110
              and
 8            Glancy Prongay & Murray LLP
              Joseph D. Cohen, Esq.
 9            1925 Century Park East, Suite 2100
              Los Angeles, California 90067
10            for Plaintiffs

11            Wilmer Cutler Pickering Hale and Dorr LLP
              Michael G. Bongiorno, Esq.
12            Joseph J. Yu, Esq.
              7 World Trade Center, 250 Greenwich Street
13            New York, New York 10007
              and
14            Wilmer Cutler Pickering Hale and Dorr LLP
              Peter J. Kolovos, Esq.
15            Katherine V. Mackey, Esq.
              60 State Street
16            Boston, Massachusetts 02109
              for Defendants

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2          THE CLERK:  All rise.

 3   (Court enters.)

 4          THE CLERK:  Court is now in session on the matter of

 5   In Re Ocular Therapeutix litigation, Civil Action 17-CV-12288.

 6          Counsel, please identify yourselves for the record.

 7          MR. VAN:  Austin Van on behalf of lead plaintiffs, and

 8   with me are Joseph Cohen from Glancy Prongay & Murray, he's

 9   co-lead counsel, and Daryl Andrews, who is liaison counsel.

10          THE COURT:  Good afternoon.

11          MR. BONGIORNO:  Good afternoon, your Honor.  On behalf

12   of all defendants, from Wilmer Hale, Mike Bongiorno, Peter

13   Kolovos, Joseph Yu and Katherine Mackey.

14          THE COURT:  Okay.  Defendant's motion.

15          MR. BONGIORNO:  Thank you, your Honor.

16          THE COURT:  Good afternoon again.

17          MR. BONGIORNO:  As I mentioned, I represent all of the

18   defendants in this case, but there are only, I guess, three

19   active defendants for this motion because the plaintiffs

20   concede, right at the beginning on page 1 of their opposition

21   to our motion, that they are not contesting the motion to

22   dismiss as it relates to George Migausky and Eric Hurley.  So

23   we're -- Andrew Hurley, I apologize.  So we're left with Amar

24   Sawhney, Eric Ankerud and the corporate defendant Ocular.  And

25   those three defendants should be dismissed, just like the other
```

1    two were dismissed, your Honor, because this is another

2    textbook example of fraud by hindsight based on a company, like

3    others we've seen before, that is going through an FDA process

4    and dealing with their regulator, and the back and forth with

5    the regulator ultimately hits a few bumps in the road.  Those

6    are disclosed as they happen, the stock price goes down, the

7    market reacts, but yet at the end of the narrative, when the

8    stock price settles, wherever it settles, we see a lawsuit.

9         In fact, we saw the lawsuit before the end of the

10   class period.  I think the lawsuit was filed in early July, and

11   it wasn't for another couple of days that the rest of the air

12   had been taken out of the stock, and ultimately when the

13   definitive complaint was filed, it was filed with a class

14   period that ends after the first complaint was filed.  So they

15   were pretty anxious to pursue this case, but it's not much of a

16   case when you get down to it.

17        It's really just another case about some disappointing

18   results from the back and forth with the FDA regarding some

19   manufacturing issues that they observed and had caused the FDA

20   to issue a complete review letter in response to the original

21   new drug application, and then another complete review letter

22   in response to the resubmitted new drug application that

23   resulted in delays in getting this product ultimately approved.

24        Of course in the meantime, there were inspections of

25   the manufacturing facilities up here in Bedford, and those

1    inspections resulted in 483s being issued.  I know the court's

2    familiar with what those are from the *Genzyme* case, but those

3    are non-final, non-definitive observations that the FDA makes

4    when it visits a manufacturing facility for one of its

5    regulated companies.

6            You know, here the Form 483s were issued.  The company

7    disclosed them.  The company submitted new drug applications.

8    The FDA came back within the PDUFA deadlines that are set by

9    statute for responding to a new drug application.  They issued

10   a complete review letter.  The complete letter says the drug

11   isn't approved at this time.

12           They resubmit.  There's another inspection.  There's

13   another 483.  That's disclosed.  The NDA is considered, the

14   PDUFA deadline comes.  The FDA again says, can't approve it

15   this time.  Fortunately the drug was ultimately approved last

16   year.  So these issues were overcome, but in the meantime these

17   bumps in the road caused some hits in the stock price and

18   ultimately this lawsuit.

19           But this lawsuit is different from other lawsuits,

20   even ones that didn't survive.  It's easily distinguishable

21   from the ones that did.  It's also an even weaker case than

22   some of them that didn't, including the one I mentioned before,

23   the *Genzyme* case, which this court decided and was confirmed by

24   the First Circuit, of course.  In that case, the 483s were not

25   disclosed immediately.  They weren't disclosed until later,

1    when other things happened, like a warning letter.

2         Here, in both instances, the 483s were disclosed.

3    It's a strange case.  Right?  The class period starts the day

4    the company discloses the 483.  And what's the theory?  The

5    theory is that the company said that it complied with cGMP,

6    good manufacturing practices.  And the theory is, well, that

7    has to be false or misleading because the company had a 483

8    letter that observed these violations of FDA protocols.

9         Well, we know two things, right?  We know, number one,

10   it's not a definitive conclusion of anything.  It's just an

11   observation that the company has an opportunity to respond to.

12   We also know, number two, that it was disclosed publicly.  So

13   whatever you can take from the fact that the company got a 483

14   letter from the FDA, it's publicly known.

15        So if the plaintiffs are right, as they say in their

16   complaint, that the existence of a Form 483 shows -- what did

17   they say -- strongly indicates to investors that the company is

18   not in compliance with cGMP -- I don't think that's what it

19   says or what it actually indicates, but if they're right about

20   that, the public knows about it, because they disclosed the

21   existence of it.  So if it is such a strong indication of

22   violations of cGMP, then the public knows about that, and the

23   statement, the sort of generic one sentence in a 120-page 10-K

24   that says we complied with the cGMP but the market is not going

25   to take anything from that relative to the Form 483, which is

1    the only thing they have.

2         I know that in *Genzyme* -- I'm sorry.

3         THE COURT:  Are you saying that a statement that is so

4    bald-facedly wrong that the public understands it to be untrue

5    is not an actionable statement?

6         MR. BONGIORNO:  Well, I certainly wouldn't put it that

7    way, your Honor, but I understand what you're saying.

8         THE COURT:  I wouldn't think you would.

9         MR. BONGIORNO:  I don't think it's so obviously wrong

10   in any respect.

11        What I am saying is, because I don't buy for one

12   second the plaintiffs' notion that the existence of a 483 so

13   strongly indicates violations of cGMP, what I am saying is if

14   you take them at their word that that's what it means, it's all

15   in one paragraph.  The paragraph about the 483 starts in the

16   10-K with, We are regulated by the FDA.  The FDA enforces its

17   rules and regulations.  The FDA makes sure the companies are in

18   compliance with cGMP.  It says, actually cGMP in the paragraph

19   about the 483.  It says they come and they inspect.  They

20   inspected last year.  They issued a Form 483.  We resolved it.

21   Then they came this year and issued another one, and we're

22   trying to resolve that one.  But if we don't, it could delay

23   the approval.  It could delay the application.  It could delay

24   the approval of the application.  It could result in fines,

25   penalties, suspensions.

1          It's all right there for the reader, so the reader can

2    understand what's going on at the company.  The company has a

3    product at the time, by the way, that it is manufacturing and

4    selling.  DEXTENZA was not its only product.  So obviously the

5    company is manufacturing things in accordance with cGMP or the

6    FDA would have put a stop to the manufacture or sale of the

7    earlier product.

8          The point is they came in and they observed some

9    things that they viewed as irregular that they think the

10   company should deal with and address, and the company discloses

11   right up front.  We just got this, and we're trying to address

12   it.  But if we can't address it, then it's going to be a

13   problem with our application, with the approval process, and

14   could result in delays.  I'm not sure what else they were

15   supposed to say.

16         *Genzyme* had basically the same disclosure in its 10-K

17   about cGMP, and that's in the complaint in the *Genzyme* case.

18   And in *Genzyme* they don't even disclose the 483 until months

19   later.  But the court was absolutely right, and you obviously

20   don't need me to tell you that.  The First Circuit said so.

21         THE COURT:  And I believe them when they say that.

22         MR. BONGIORNO:  I do too, your Honor.

23         THE COURT:  I don't always believe them.

24         MR. BONGIORNO:  Right.  Your Honor, I do especially in

25   this case.

1          THE COURT:  Let me clarify one point.

2          MR. BONGIORNO:  Sure.

3          THE COURT:  DEXTENZA was used for two applications, or

4    was intended for two applications, I understand.  One was for

5    pain relief.  One was for something else.  One was in Phase II

6    and one was in Phase III.  Does that make any difference?

7          MR. BONGIORNO:  I don't think so.

8          THE COURT:  It's the same drug, so it doesn't matter?

9          MR. BONGIORNO:  Yes.

10          THE COURT:  Okay.

11          MR. BONGIORNO:  And it's inserted into the eye --

12          THE COURT:  Right.

13          MR. BONGIORNO:  -- to release the drug to avoid, you

14    know, patients post surgery having to put in eye drops, which

15    they're not going to necessarily do exactly the way they're

16    supposed to do.  It's a lot harder to do.  An implant is

17    obviously a serious surgical procedure, but once it's done, the

18    drug is released from the implant in the eye, and that's it,

19    and it deals with inflammation, and it deals with irritation in

20    the eye, pain in the eye.  So it does have those two

21    indications.  It's called a plug for what that's worth.  It

22    doesn't sound very pleasant to me, but apparently is a good

23    thing for folks who are suffering from that particular issue.

24          So just to go on to what the statements are that we're

25    dealing with.  We already touched on the first one, your Honor,

1  regarding the compliance with cGMP.  Again, I think that it's a

2  tough case to make out that that's a false and misleading

3  statement when in the same document and, indeed, in a paragraph

4  that discusses cGMP, the company's discussing exactly what is

5  going on with the 483.

6        Now, I don't concede for one second that the company

7  wasn't complying with cGMP.  My only point is that even if they

8  weren't, or even if those FDA observations, which are not

9  final, ultimately ended up being part of what the FDA decided

10  when they issued the CRL, at that point in time, A, they're not

11  final, they're just observations.  So there's no reason for the

12  company to change what it's saying.  And, number two, the

13  information is out there anyway.  It's in the same document.

14  It's in the same paragraph.  It's hard to make an omissions

15  case out of something that was supposedly withheld from the

16  market when it's in the very same document from which it's

17  supposedly omitted.  So that information is there.

18        So all they're left with is, well, the 483 is worse

19  than you said.  It was really bad.  It wasn't just kind of bad.

20  It was really bad.  And the case law doesn't support any notion

21  like that.  The company doesn't need to say, and there's no

22  basis for them to have said, you know, this is a massive

23  problem that requires a complete overhaul of our manufacturing

24  processes, which is what they say we should have said.  There's

25  no basis for that.  There's no confidential witness that says

1    anything like that.  There's no internal document that says

2    anything like that.  There's not even an allegation that that's

3    actually what had to happened.  It's just their blanket

4    statement of hyperbole that this was so bad that the drug could

5    never be approved and the manufacturing process could never be

6    fixed.

7         Of course, ultimately it was fixed and the drug was

8    approved, but that's beside the point.  I understand that we're

9    viewing this contemporaneously with when things were said.  And

10   I don't want to say that we get truth by hindsight any better

11   than they get fraud by hindsight, but they don't get fraud by

12   hindsight here.  It has to be what did they know at the time.

13   We haven't even gotten some answers yet.

14        But what are the facts?  I mean, the facts are they

15   got a 483.  They disclosed it.  They tried to respond to it as

16   best they could.  They gave general statements of optimism

17   surrounding it.  That was before this court, the *ConforMIS*

18   case.  And in that case this court held that those types of

19   statements, like we have here, "we think," "we believe," are

20   just blanket statements of opinion.  Not only are they

21   forward-looking, they're statements of opinions.  And for both

22   of those reasons, those type of statements aren't actionable.

23        So the statements that we have in the conference

24   calls, that the two defendants, active defendants, namely

25   Dr. Sawhney and Mr. Ankerud, about, We think we'll be able to

1    address this, we believe we're on track and will be able to

2    respond in a timely matter, those aren't actionable for the

3    simple pure reason that they are forwarding-looking, they are

4    statements of opinion.  So there's no basis to say that they

5    were fraudulent when they were made.

6           Getting to the scienter point on those statements,

7    again, we have nothing, nothing to show that the plaintiffs

8    didn't believe -- or that the defendants didn't believe what

9    they were saying when they said it, that it wasn't reasonable

10   for them to think that they could overcome these things in a

11   timely manner.  All we have is they didn't overcome them in a

12   timely manner, therefore, they weren't true when they said

13   them, and not only that, the defendants didn't think they were

14   true.

15          Then they tried to turn scienter right on its head

16   because we have no sales of stock during the class period.  We

17   have a large purchase of stock during the class period by

18   Dr. Sawhney.  And that's over 50,000 shares that he bought

19   during the class period, more shares than three out of the four

20   the lead plaintiffs bought during the class period.  But

21   somehow when the defendants buy that many shares, that's not a

22   lot of shares.  50,000 shares is a lot of shares.  And they

23   say, well, not for Dr. Sawhney, it's not, because he owned tons

24   of other shares.  Okay.  What does that tell you?  That he had

25   a huge amount of shares that he could have sold if he thought

1    the stock price was inflated, but not only did he not sell any

2    of them, he bought some.

3         Then they say look at the *ModusLink* case, Judge.  In

4    that case the court -- I think it was Judge Casper -- said,

5    Well, maybe if you're buying stock it's because you're trying

6    to hide something, whatever, and they say you can take that

7    inference.  The *Abiomed* case from the First Circuit from 2015

8    disposes of that notion.

9         Accumulated stock during the class period weighs

10   against motive and, therefore, against scienter, not for it.

11   So you don't have anything resembling a feather on the scale

12   for scienter, but you have this against it, and you also have

13   the very reasonable -- reasonable inference here that these are

14   folks who were trying to address this problem.

15        They got a letter from the FDA, that the plaintiffs

16   don't dispute, that said with regard to the first 483, there

17   was a press release after that 483 came that the company issued

18   that said, We're responding to it.  We've submitted our plan,

19   and the FDA's agreed with our plan for dealing with nine out of

20   the ten observations from the first 483.

21        So the reasonable inference is that here you have a

22   company that's making progress with the FDA, disclosing

23   everything as it happens.  You get a 483, you disclose it;

24   submitted an NDA, got a CRL within the PDUFA date, disclosed

25   that.  Resubmitted an NDA, disclosed that.  Got another 483

1    from the second inspection, disclosed that.  Got a CRL in

2    response to that second NDA, disclosed that.

3         So the back and forth and the cadence with the FDA is

4    typical.  It's not perfect.  It's not what the shareholders

5    hoped for.  It's not what the company hoped for, but it's not

6    unusual and it was all disclosed from start to finish.

7         The only thing left to disclose is how bad it was.

8    Look how bad this 483 was.  Look how bad that 483 was.  Again,

9    I go back to the *Genzyme* case, and all the different cases

10   cited in it in the First Circuit that say you don't even have

11   to disclose a 483.  Maybe there are some circumstances where

12   you do, I suppose.  But in that case you had 483s that weren't

13   even disclosed, and there was no claim stated.  I mean, you

14   have some of these cases where people are getting indicted and

15   there are criminal complaints and other things going on.  Here

16   there's nothing like that.  All you have -- they try to throw

17   an SEC investigation that has led to nothing to date onto the

18   scale in favor of scienter.  That doesn't work.  An SEC

19   investigation doesn't equate to scienter.  All you have are

20   interim disclosures along the way, public statements about

21   what's happening, the stock price going down and, again, the

22   class period that started with a disclosure that the company

23   got an observational letter from the FDA, a 483, saying here

24   are some issues with your manufacturing.

25         Now, the other thing they're going to say undoubtedly

1    is, because it's in their papers, is, well, the second 483

2    shows that they never fixed anything from the first 483, and it

3    was going on the whole time and, therefore, it's unreasonable

4    to say that they were making progress and these forward-looking

5    statements and these statements of opinion had no reasonable

6    basis because they were never in compliance because they never

7    fixed anything.  Well, first of all, a comparison of the two

8    483 letters shows that that's not true.

9           Second of all, again, that's fraud by hindsight.

10   That's, you said you thought you could fix the issues in the

11   first 483, but you were lying; and do you know how we know you

12   were lying?  Because you didn't fix them.

13          That's not a securities fraud case.  That's a failure

14   to get to the point you're trying to get to.  That's a failure

15   to get to the end zone when you're on your way or you hope

16   you're on your way and you think you're on your way.  But it's

17   not even true in the first place because the second 483 makes a

18   point that I hate saying because I can never pronounce it, a

19   particulate matter is what it says, that there's a particulate

20   matter, a foreign substance, in the plug or in the drug,

21   whatever, the product that's being produced.

22          In the complaint they try to say, look at that, that's

23   a bombshell disclosure.  I don't know if it's a bombshell

24   disclosure or not, I don't think so, but it's our disclosure.

25   We said it.  It's in the 483.  But it's not in the first 483.

1   If you read the complaint and you read the opposition to the

2   motion to dismiss, you would think it is in the first 483, but

3   it's not.  They try to extrapolate that it must have been part

4   of the same issue and the same problem or whatever, but it's

5   not.  The FDA doesn't say it until the second one.  So this

6   notion that there's this one long lingering problem that we

7   keep trying to gloss over and say isn't a problem is just not

8   true.  It doesn't hold out.

9       So we don't have a false or misleading statement.  We

10   don't have an omission, because the thing that they say was

11   omitted that caused the statement to be false and misleading

12   was actually said, unlike the case law that is already in our

13   favor.  We actually go one better by disclosing it.  So we

14   don't have a false and misleading statement.  We don't have an

15   omission.  And we certainly don't have scienter.

16       For all of those reasons, your Honor, I would ask that

17   this court dismiss this case and that it do so with prejudice,

18   like it's done in *ConforMIS*, like it's done in *Genzyme*, and

19   there's no reason to think that this case is any different or

20   would look any different if they were allowed to amend.

21       If the court doesn't have any questions, I will --

22       THE COURT:  Thank you.

23       MR. BONGIORNO:  Thank you.

24       MR. VAN:  So lead plaintiffs respect what Ocular is

25   doing.  They're trying to develop a drug for post-surgical

1    pain.  No doubt that was one of the reasons that lead

2    plaintiffs purchased their stock.  It's an admirable goal.  But

3    it has to be said that during the class period Ocular was a

4    completely inept drug manufacturer.  There are two general ways

5    in which this company didn't have its act together in

6    manufacturing drugs.  Many more than that, but I think that

7    most of these observations can be described in two sets.

8         The first is that the company didn't have a recipe for

9    making their drug.  The company didn't know how to make

10   DEXTENZA.  They hadn't figured it out yet.  They were not able

11   consistently to make their drug product.  They weren't able to

12   make a drug that had the strength and quality and purity that

13   they claimed it had.  They weren't able to make this drug.

14        The second is that there was stuff in the drug that

15   they didn't know what it was.  There was unidentified stuff in

16   this drug throughout the class period.  That's a huge problem.

17   You can't be putting a drug out into the market that has some

18   unidentified stuff in it that, incidentally, turned out to be

19   aluminum, a heavy metal, toxic to humans, and expect the FDA to

20   approve your drug.  There is no -- anyone sitting in this

21   courtroom recognizes that if, A, you don't have a recipe for

22   your drug, you haven't figured out how to make it, and, B, you

23   have stuff floating around in your drug and you don't know what

24   it is, it might be toxic, the FDA isn't going to let your drug

25   go forward.  It's not going to say it's compliant with current

1    good manufacturing practices.  Any old fool would know that.

2    Defendant Ankerud and the person to whom he reported, Sawhney,

3    aren't any old fool.  They had a lot of experience in this area

4    and they certainly knew it.

5         So there are only two elements at issue here that

6    they're disputing with respect to this Section 10(b) claim,

7    falsity and scienter.

8         Falsity really should not be in dispute, at least with

9    respect to the cGMP compliance statements, because the FDA in

10   these complete response letters that were issued twice during

11   the class period said we have determined that your operations

12   are not compliant with cGMP for the reasons that we offered in

13   our February Form 483s.  It's been determined.  The government

14   agency responsible for making this determination has said you

15   weren't compliant.  So falsity, was it a true or false

16   statement, we are cGMP compliant?  No, it shouldn't be a

17   question.

18        All the defendants say on this is nothing to do with

19   falsity.  Their response goes to scienter, but we're not

20   talking about scienter at the moment.  We're talking about

21   falsity.  Falsity should not be at issue here because the

22   government has made a determination of falsity.

23        Scienter is just as clear, and, frankly, we don't even

24   need these complete response letters to show falsity.  Falsity

25   is also totally clear, as is scienter, from the observations

1    made by these inspectors that went into the facility and looked

2    around and made descriptions.  They described the conditions of

3    the manufacturing operations.  And we plead those, and this

4    court has to accept our well-pleaded allegations of those

5    descriptions of the manufacturing operations as true.  So they

6    are true.  And as we've gone through before, those -- the gist

7    of those observations were that the company didn't have a

8    recipe and it had stuff floating around in its product.  And it

9    should be clear to everyone, certainly including defendants,

10   both the statement of false -- the falsity is clear from those

11   observations because they're not cGMP compliant if there's no

12   recipe and there's stuff floating, and they should have known

13   they weren't cGMP compliant if they didn't have a recipe and

14   there was stuff floating around in their product.

15         So let's go through the four misstatements -- well,

16   four dates of misstatements and get a little more specific.

17         So the first false and misleading statement is in the

18   March 2016 Form 10-K, and that is the first time the company

19   comes out and says, We are cGMP compliant.  Of course they

20   weren't.  They had received a Form 483 detailing the

21   inspectional observations made by the inspector in February of

22   2016.

23         Now, defendants throw up their arms and say it's not

24   the case, as this court correctly held, by the way, in *In Re*

25   *Genzyme*, it's not the case that just because the company

receives a Form 483 that the company should know that it's not

cGMP compliant.  That does not follow.  We absolutely agree

with your Honor on this point and with defendants.  It says on

the Form 483 this is an interim observation.  We're not

claiming to the contrary.

The only relevance of the Form 483 is it's the same

relevance they would have if they were made by a third-party

inspector who wandered into the operations and faithfully wrote

down descriptions of what he saw, said these are what the

operations are like.  Those descriptions are pleaded with great

specificity, and the court has to accept them as true.  That's

the only purpose of the Forms 483.  And it follows from those

observations that -- it's just obvious that the company wasn't

compliant with cGMP because they didn't have a recipe and there

was stuff floating around in their product.  And they knew that

much because everybody in this room knows that.

Okay.  In the reply defendants say, well, there is

this case which said that if the company receives a Form 483,

then that's not sufficient to show that the company knew that

it wasn't cGMP compliant.  So it's also -- it must be the case,

it follows that the observations made in the Form 483 aren't

sufficient to show that a company isn't cGMP compliant.  Non

sequitur.  The observations, just as in this case, absolutely

are sufficient.  The observations are just descriptions of what

was going on in the facility, and from those observations it's

1   clear that the company did not have -- was not close to having

2   its act together in the manufacturing of this drug.  It didn't

3   even know how to make it.

4        So the November 9 conference call.  Here the company

5   states, We've adequately, we think, addressed the issues that

6   they have raised.  Now defendants say, Well, this is puffery.

7   It's clearly not.  This is a statement about compliance.  We

8   think we've adequately addressed the issues is just to say we

9   think we're now compliant.  We think we've adequately addressed

10  the issues.  We think we're compliant with cGMP.  And a

11  statement of belief in compliance is actionable under *Omnicare*.

12  It's actually the example that the Supreme Court gave in

13  *Omnicare* of an actionable statement of opinion.

14       And the standard under *Omnicare* for the actionability

15  of a statement of opinion is that the statement is actionable

16  if it does not fairly align with the information in the

17  speaker's possession at the time.  Regardless of whether the

18  defendants believed -- were completely irrational and for some

19  reason thought that their operations, when they didn't have a

20  recipe and there was stuff floating around in their product,

21  that they didn't know what it was, was cGMP compliant, even if

22  they irrationally believed that, the information in their

23  possession at the time, which was a list of these things, a

24  list of ways in which they were not cGMP compliant, a list of

25  the problems, a description of their facilities, did not fairly

1    align with that belief.  This description saying, well, you

2    don't have a recipe, did not fairly align with their statement

3    we are cGMP compliant.  So this opinion, we've adequately

4    addressed the issues, is actionable, just as any other

5    statement of belief in compliance would be actionable.

6           So defendants say, well, there are no contemporaneous

7    facts showing that as of November 9 or November 2016 the

8    company wasn't cGMP compliant.  So that's certainly not the

9    case.  These problems were continuing.  So there's two problems

10    that I put forward:  No recipe and stuff floating around in the

11    product were in both inspectional observations, and I can go

12    through and show you that.

13           In the first, February 11, 2016, Observation 3 is that

14    they didn't have procedures.  Procedures were not established

15    to monitor outputs and validate manufacturing processes

16    responsible for causing variability in the in-process material

17    and the drug product.  And they specified that what was really

18    going on here was that the company hadn't figured out a way to

19    mix the product together in such a way that the bulk

20    preparation of the product was consistent throughout.  And that

21    can be tricky.  It can take years.  In fact, in this case it

22    did take years.  They didn't know how to make their product,

23    and that is clear from Observation 3.  That's what it's saying.

24    And we consulted an expert at length and went through all these

25    observations and that's what the expert told us.  Okay.

1      And then as for stuff floating around, Observation 1

2   notes that there was a regularly occurring impurity.

3      Observation 6 says that the control didn't include

4   procedures designed to assure purity.  Observations 7 and 8

5   note that the company didn't even have the right equipment to

6   assure that there was no product contamination or micro-

7   organism growth.

8      So both of these concerns were clearly present in the

9   first Form 483, and they remained in the second Form 483.  As

10  for, We don't know how to make the product, Observation 3 says,

11  "There are no written procedures for production and process

12  controls designed to assure that the drug products have the

13  identity, strength, quality, purity they purport or are

14  represented to possess."  No recipe.

15     And as for the stuff floating around in the product,

16  well, that's front and center, Observation number 1.  There was

17  unknown and uninvestigated particulate matter that had been

18  found in 10 of 23 of the lots they produced.  What happened to

19  those other lots?  They were scrapped before there was even a

20  visual inspection of them.  That's how bad those lots were.  Of

21  the 10 that survived, those had unknown particulate matter,

22  unknown and uninvestigated.  The company wasn't even looking

23  into it before the FDA came along.

24     And what was that stuff?  They noted that it was

25  aluminum, a heavy metal.  That's bad stuff.  You don't want to

1  be eating aluminum.

2      Observation 4 noted that the procedures for the

3  quality control unit were not in writing.  That also goes to

4  purity.

5      Observation 5 noted that the laboratory controls were

6  not appropriate to assure purity.  It also goes to stuff

7  floating around in the product.

8      So these two concerns were present throughout.  So any

9  notion that at any point the company was cGMP compliant

10  suggests that maybe three days randomly and then this two-year

11  period the company happened to come across and have a recipe,

12  and it happened to eliminate all this free-floating stuff in

13  their product.  But then three days later imagine that they

14  went back to being non-compliant.  It's a ridiculous notion

15  that reasonable jurors would not accept.

16      THE COURT:  I understand you've taken the position

17  that the fact of citation in a 483 establishes the fact

18  alleged.

19      MR. VAN:  Yes, your Honor.

20      THE COURT:  Without any further process?

21      MR. VAN:  I'm not sure I understand the question.

22      THE COURT:  Discussion, dialogue, none of that can

23  affect the factual certainty or the established fact --

24      MR. VAN:  That's absolutely right.  The FDA doesn't go

25  back and do a second inspection.

1          THE COURT:  No, no.  I just want -- you're saying when

2    the 483 says you don't have a procedure adequate to do this,

3    that that fact is then established.

4          MR. VAN:  Yes.  That observation is -- well, the legal

5    -- what is not established, what remains interim is the legal

6    conclusion drawn from those observations.  And this is a

7    distinction that is critical.

8          THE COURT:  Well, what I'm getting at, perhaps you can

9    foresee, is that the process itself seems to allow for some

10   back and forth between the company in response and the FDA in

11   response to the assertions in the 483.  And apparently, it

12   seems to be the case in many cases, they work it out, which

13   means -- I guess, which is -- it means the facts change

14   somehow.  So that's what --

15         MR. VAN:  Right.  So --

16         THE COURT:  The assertion of it by a citator

17   establishes it, but it might change because it might be

18   resolved.  So the violation goes away and the non-compliance

19   goes away, and so on and so forth.  Isn't that the real world?

20         MR. VAN:  They could change it.  But it would still --

21   it would remain true that as of the date of the inspection, the

22   observations of their facilities and their manufacturing

23   processes were as they were.  And this court can't challenge

24   those factual allegations.  Those are well-pleaded factual

25   allegations that have to be accepted as true for the purposes

1    of the motion to dismiss.  This is not the time for us to be

2    having --

3            THE COURT:  It's certainly true they were stated, they

4    were cited.  There's no question about that.

5            You're saying it establishes the historical fact of

6    the situation on the ground as it were.

7            MR. VAN:  It absolutely does.  All we need --

8            THE COURT:  What's the point of an iterative process

9    with the company then that the FDA itself allows?  The FDA

10   doesn't even take it as an established fact forever.  Why

11   should anybody else?

12           MR. VAN:  Well, this court --

13           THE COURT:  Except by the time the complaint gets

14   filed.

15           MR. VAN:  So I'm not sure your Honor is right.  In

16   fact, respectfully, I think you're wrong.  I think the FDA

17   doesn't say, well, those processes weren't -- the inspector was

18   hallucinating.  The inspector didn't adequately describe what

19   was the conditions of the site.

20           THE COURT:  No, they wouldn't say that.  They would

21   just say, okay, after further investigation, and we understand

22   now, the company does this and has corrected this, and the

23   model has changed, and so on.  Now we're satisfied.  We

24   withdraw the objection.  It's okay now.  Isn't that what

25   happens sometimes?

1          MR. VAN:  It's absolutely not what happened here.  At

2    no point did the FDA say, Well, something changed and now those

3    observations that we made back in the day aren't accurate

4    somehow.  At no point did that happen.

5          So we absolutely have a legitimate basis to plead that

6    the conditions of the facility were as they were described.

7    That's all we need, incidentally.  We're not relying on any

8    legal conclusion.  It could just as well not have been the FDA

9    that was doing these inspections.  It could have been some

10   random third party who happened to know something about drug

11   manufacturing wandering in and looking around and writing down

12   in a journal what he saw.  That would be a legitimate basis for

13   us to plead the conditions of the manufacturing facility as of

14   that date.

15         So certainly if the FDA's inspector, who he is a, you

16   know, a government inspector, a priori is a legitimate basis to

17   plead the conditions of the manufacturing facility.

18         THE COURT:  Some of those things might be objectively

19   determinable.  For example, the 483 might say the temperature

20   in the lab was 96 degrees Fahrenheit.  That's way too high.

21   Okay?  There might also be a judgmental component like how high

22   is way too high?  A good bit of the FDA regulations on

23   manufacturing practices use words like "appropriate" and things

24   like that, involving some judgment.

25         And couldn't there be a reasonable scientific dispute

1  about whether something was a certain level, if something was

2  appropriate?

3        MR. VAN:  Maybe at some point in this case we'll have

4  a factual dispute about whether or not the inspectors were

5  correct.  That's certainly not the stage that we're at now when

6  we're simply pleading allegations, your Honor.

7        THE COURT:  Right.  So the initial citation of the 483

8  should be taken as fact, even though there might be some debate

9  about the correctness of subjective judgments?

10        MR. VAN:  So I don't think -- so yes.

11        THE COURT:  Okay.

12        MR. VAN:  By the way, yes, absolutely.  Your Honor is

13  required to accept --

14        THE COURT:  That's what I had understood you to say,

15  and I just wanted to be sure I was understanding you.

16        MR. VAN:  Right.  But just to -- these concerns, like

17  you don't have a recipe, aren't -- they literally did not have

18  a written protocol, and the existence or non-existence of a

19  piece of paper is kind of like measuring the temperature.  We

20  observed things floating around in your product is like looking

21  at the temperature.  These are not subjective judgments.  There

22  either are or are not things floating around in your product.

23  That might distinguish this case from other -- I don't know,

24  but in this case, it's -- there's no issue on the concerns your

25  Honor was raising.

1          THE COURT:  Okay.

2          MR. VAN:  Okay.  So they say, well, in August 2016

3     there was this letter from the FDA, and that must have given

4     them some strain of hope.  So it was fine for them to lie about

5     their progress.  No.  The August 2016 letter was just a

6     statement that the remediation plan that the company had given

7     looked good to the FDA.  It was in no sense some kind of an

8     affirmation from the FDA that the problems had actually been

9     resolved.  It didn't even speak to whether the problems had

10    been resolved.  So there's certainly no reasonable reliance

11    that defendants had on this letter saying the plan -- you know,

12    if you were to do all these things, then, you know, you'd be

13    looking good for approval.  And we believe that they didn't do

14    anything, that they didn't follow up what they intended to do

15    in the August 2016 letter.  So it's of no value to a defendant.

16         The March 2017 misstatements.  Okay.  So this is,

17    again, just a statement of cGMP compliance.  It's false and

18    misleading for the reasons we've described.  There are these

19    two fundamental, you know, red siren issues that this company

20    had not dealt with, you know, within -- six weeks later when

21    there was an inspection and those problems weren't resolved.

22    And everybody should have known that.  Everybody in this room,

23    certainly defendant Ankerud, should have known that these

24    problems put them nowhere near cGMP compliance.

25         Then they say, okay, well, there are these disclosures

1  that we had in our Form 10-K, and those disclosures were --

2  there were issues with the, quote, manufacturing processes,

3  issues with, quote, analytical testing and a particulate matter

4  issue.  So it's actually verifiable -- like this is an unusual

5  case in which we can actually verify the significance of what

6  was omitted from these statements, just how little these

7  statements told investors, and that's because -- defendants are

8  correct -- defendants revealed they'd received a Form 483 and

9  said these three cute phrases about the Form 483.

10      But then -- then -- in July of 2017, when for the

11  first time Seeking Alpha, a Wall Street reporter, actually made

12  public the actual Forms 483, and the public investors learned

13  for the first time all the detail that was in those Form 483s,

14  importantly learned for the first time the big, you know,

15  blaring red sirens that should have been articulated about what

16  was in the Forms 483, when investors learned what was -- you

17  know, that the stock tanked 30 percent.  There's simply no

18  question that what was left out mattered a whole lot.  They

19  didn't convey what they needed to.

20      Okay.  The May 5 comments follows the last set of

21  statements and some of the most outrageous.  The company said

22  one day after receiving this Form 483 detailing the conditions

23  of the factory, the manufacturing operations as they were,

24  showing that almost half of their product that they released to

25  the public contained particulate matter inclusive of heavy

metals.  One day later the company says, "Our manufacturing

process is in a fully developed mode."  Not once, twice on the

conference call they said, "Fully developed."  "Our

manufacturing process is fully developed."  Nothing more to be

done.  Capital F fraud.

The other statements on the May 5 conference call I

don't like as much.  The second one I like more than the third.

The second one is -- in response to a question, "Is there

anything that could delay the action dates specifically," and

Ankerud replied, "Nothing that we can currently see.  Nothing

could delay -- nothing that we can currently see could delay

the PDUFA action date."  That's not a statement about the

future.  It's actually a statement of current conditions,

current potential.  The conditions as they are, nothing among

those current conditions that we can see could delay the PDUFA

date.  It's just an outrageous statement.  It's verifiably

wrong given the conditions in the factory as described and

alleged one day prior.

The third is a forward-looking statement, frankly,

that they couldn't resolve -- or that the company could resolve

the problems in a timely manner, as in the next six weeks or

so.  That was flatly wrong, but it's nevertheless actionable,

because there was an omission in that statement.  Even if they

absurdly believed that within six months they could turn around

these massive problems, they omitted the facts that all the

1    other investors and the rest of the rational world wanted to

2    know, that there are these huge red flags, problems in the

3    company.  And statements of omission are actionable.  The safe

4    harbor provision does not apply to them.

5         So I think we've already discussed scienter direct,

6    and the argument is pretty simple.  If you don't have a recipe,

7    if you don't know how to make your product and you have stuff

8    floating around in your product you haven't identified, there's

9    just no way that you're compliant with any reasonable

10   regulations.  You don't even have to know what the regulations

11   are.  If you know that much about your company, you know you're

12   not going to be compliant.

13        But there's a cherry on top of the scienter cake, and

14   that's a confidential witness who was there and who spoke with

15   defendant Ankerud.  And we've described this person in

16   sufficient detail.  All we have to allege is enough to make

17   probable that this person was in a position to have had a

18   conversation with Ankerud, and that's clear.  He was in

19   regulatory affairs.  He worked two levels away from Ankerud.

20   This is a 94-person company.  Regulatory affairs couldn't have

21   had more than ten, five people.  So certainly it's probable

22   that he was in a position to have a conversation with Ankerud,

23   and that conversation, which was in January 2017, was one in

24   which Ankerud said, "We know that these batch records that

25   we're submitting to the FDA don't resolve the problems that

1    were identified by the FDA that they are not FDA compliant."

2         Now, I have to admit that the complaint on the

3    confidential witness could have been clearer, and I think that

4    a lot of the disputes that defendants had with the confidential

5    witness here are disputes about that clarity.  I can represent

6    to the court that it's clear to us, at least, that the

7    confidential witness was talking about compliance with cGMP and

8    the company's failure as of that date to be compliant with

9    cGMP.  But even if the court doesn't want to accept our

10   representations now, there's plenty for scienter, even if we

11   completely ignore the confidential witness and the confidential

12   witness is nevertheless a cherry on top of the scienter cake,

13   because it shows that the defendants were perfectly willing to

14   submit records to the FDA that they knew would not be

15   compliant.

16        THE COURT:  Does that pertain only to the 2017

17   allegations?

18        MR. VAN:  So if falsity were actually an issue in this

19   case with respect to any of this, which it is not, then it

20   would buttress falsity with respect to the March 2017

21   conclusions.  As for scienter, it buttresses all of the

22   scienter allegations because it's clear that the defendants

23   were perfectly willing to submit records to the FDA that

24   weren't compliant.  They were willing to be non-compliant with

25   FDA regulations.  And that is absolutely a part of the holistic

1    picture that the court must consider under *Tellabs* in its

2    scienter analysis.

3          I think that covers it, your Honor.  I'd love to

4    answer any questions or concerns that you have.

5          THE COURT:  All right.  I've asked them.  Thanks.

6          MR. VAN:  Okay.

7          MR. BONGIORNO:  May I briefly, your Honor?

8          THE COURT:  Briefly.

9          MR. BONGIORNO:  Thank you.

10          I'll start where Mr. Van ended, with the confidential

11   witness.  I've done a lot of these arguments over the years.

12   It's the first time I've heard that oral argument, a

13   confidential witness statement be amended to basically say that

14   the defendant committed fraud or whatever he just quoted, which

15   is nowhere in the complaint.

16          Mr. Van just said something like the confidential

17   witness said or heard Mr. Ankerud say, "We know" -- and then he

18   repeated the word "know" loudly -- "that what we're submitting

19   doesn't resolve the problems identified by the FDA."  That's a

20   very convenient statement.  I suspect that if the confidential

21   witness had reported that to the private investigator, who then

22   reported that to somebody at one of these firms, who then put

23   it in the complaint, it would have made it into the complaint.

24   It's very hard for me to believe that lawyers as good as

25   Pomerantz would forget to put in the complaint a statement that

1    says, "We know that we didn't resolve issues."  That's not what

2    the complaint says.

3         If that's what they want to allege, and I've said this

4    before in other courtrooms in this building, if that's what

5    they want to allege, put it in the complaint and let's attack

6    it.  Don't show up at oral argument and tell us what the

7    confidential witness would have said or did say but didn't make

8    it into the complaint.  It's not fair.

9         It's not fair that Mr. Ankerud, who is a named

10   defendant in this case, is accused of fraud.  It's also not

11   fair to the two other individuals who were accused of fraud and

12   named in the complaint and then dropped in the opposition to

13   the motion to dismiss.  If you're going to accuse somebody of

14   fraud, accuse them of fraud.  It's very unfortunate to hear

15   that today.

16        In any event, I want to be clear on a couple of other

17   things.  The particulate matter that was found or suspected to

18   be found in this product was in 2017, not 2016.  And I want to

19   correct something else important.  It was not, as plaintiffs'

20   counsel just said, released to the public.  The product was not

21   being sold at that time.  Nobody got product that had

22   particulate matter in it.

23        In *Genzyme*, however, because he said I'm not sure what

24   the other cases say on this point, we can be sure because in

25   *Genzyme*, the First Circuit says, "Genzyme and the FDA issued a

1  public notice to health care providers explaining that vials of

2  Cerezyme, Fabrazyme, and Myozyme were discovered to have been

3  contaminated with foreign particles, such as steel and

4  non-latex rubber."

5       Okay.  And by the way, the FDA and Genzyme entered

6  into a consent decree requiring Genzyme to pay $175 million in

7  fines.  This is Genzyme that said they were confident that the

8  product produced at the Allston facility continued to meet the

9  highest quality and safety standards.  And that case was

10  dismissed and that dismissal was affirmed.

11      So that's what we have in that case.  What do we have

12  in this case?  We have a 483 that was disclosed that either may

13  or may not establish a basis for falsity, depending on which

14  part of the brief you want to believe, which part of the

15  argument you want to believe today, because we heard the entire

16  spectrum from it establishes everything that's in it to it

17  establishes every fact to it establishes a violation of cGMP,

18  and I don't know which theory to attack because I heard all of

19  them today.  But the bottom line is that that's all it is, is a

20  483.  It's not something to be taken lightly.  It's not

21  something to be ignored.  It is important.  But it is, as the

22  court recognized in *Genzyme*, and I think perhaps suggested in

23  some of the questions today, that it's at least an issue in

24  this case, and I agree it is, if that's the court's

25  inclination.

1    The prefatory language in the 483 basically says if

2  you want to talk about this, if you have any objection to it,

3  if you want to respond to it, here's how you do it.  You may

4  discuss the objection or action with the FDA representative

5  during the inspection or submit information to the FDA at the

6  address above.  If you have any questions, call us.  And his

7  response to that is that's not what happened here.  That is

8  what happened here.  That is exactly what happened here.

9    And this notion that we didn't have a recipe, which

10 must have been said 40 times in this courtroom this afternoon,

11 of course there was a recipe.  I think a recipe is what are the

12 ingredients that go into the drug.  I think that's what it must

13 mean.

14   There was no issue about efficacy.  There was no issue

15 about safety.  The issue here was a manufacturing issue.

16 Nobody said, "Your drug doesn't work.  Go back and make it

17 work, or you're not going to get approved."  It was all issues

18 that we've been talking about all afternoon with the

19 manufacturing process that were ultimately fortunately

20 resolved.

21   So did the company have a recipe?  Of course it did.

22 Did the company need to overcome some observations that the FDA

23 made?  Yes.  And were they able to do in it a timely manner?

24 Not as quickly as they'd like but they ultimately did.  And

25 that's what this case is about and that's why this case is an

1   easier case to dismiss than many of the other cases that we've

2   cited and some of the other cases in this court, all of which

3   have been dismissed.  And that's why I ask that this court

4   dismiss this case.  Thank you.

5           THE COURT:  Thank you.  I'll take the matter under

6   advisement.

7           THE CLERK:  All rise for the court.

8   (12:57 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken February 6, 2019 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14   /s/ Kathleen Mullen Silva            2-28-19

15   Kathleen Mullen Silva, RPR, CRR            Date
     Official Court Reporter
16

17

18

19

20

21

22

23

24

25